## GUARDIAN TRUST CO. v. STUDDERT.
### No. 2030.

Court of Civil Appeals of Texas. Beaumont. Feb. 12, 1931.

Rehearing Denied March 18, 1931.

Baker, Botts, Parker & Garwood, of Houston, for appellant.

Andrews, Streetman, Logue & Mobley, of Houston, for appellee.

WALKER, J.

On August 17, 1907, appellee, James H. Studdert, executed and delivered to H. Hamilton his promissory note as follows:

"$26,250/00

"Houston, Texas, Aug. 17th, 1907.

"Five years after date, I promise to pay to H. Hamilton or order the sum of twenty-six thousand two hundred and fifty no/100 dollars, at Houston, Texas, for value received, with interest at the rate of six per cent per annum from date.

"This note is given in payment for one hundred and fifty shares of the capital stock of the Houston Ice & Brewing Company this day bought from H. Hamilton, and to secure the payment of the same, certificates of the capital stock of the Houston Ice and Brewing Company for one hundred and fifty shares are hereto attached.

"The dividends earned by this stock attached hereto shall be and are payable to H. Hamilton and are to be credited on this note.

"[Signed]    J. H. Studdert."

On the same day Mr. Hamilton executed and delivered to appellee his contract, as follows:

"The State of Texas, County of Harris.

"Be it known hereby that I have sold James Studdert, my faithful employee and true friend, 150 shares of the stock of the Houston Ice & Brewing Co. @ $175.00 per share, $26,250.00, or for the total sum of twenty-six thousand two hundred and fifty dollars as evidenced by his note for the said sum of $26,250.00 payable to my order, due five years after date.

"I hand this to Mr. Studdert to witness my acknowledgment that I hold his note; and my agreement that I require that all dividends that may be paid upon the said 150 shares of stock shall be paid to me for the full five years unless the dividends should sooner liquidate the amount of his note; and to further witness my agreement that I look to the dividends upon the stock to pay out the note and if the same is not paid by the dividends within 5 years then in that event Mr. Studdert may pay me the balance that may remain due at the end of the 5 years, or maturity of the note, in cash or Mr. Studdert may surrender the stock to me and I will accept the same in full payment of the note and surrender the said note to Mr. Studdert cancelled and receipted in full, just as Mr. Studdert may elect.

"I further acknowledge that to the note of Mr. Studdert herein mentioned there is attached certificates of the stock of the Houston Ice & Brewing Company for one hundred and fifty shares.

"Houston, Texas, Aug. 17th, 1907.

"[Signed]    H. Hamilton.

"Witness at request of Mr. Hamilton.

"[Signed]    R. L. Autrey."

Beginning with October 31, 1907, and continuing to August 20, 1914, practically all of the stock mentioned in this contract was carried on the books in Mr. Hamilton's name and all dividends on this stock were paid to Mr. Hamilton and charged to him on the books of the Houston Ice & Brewing Company. On the 22d day of June, 1913, appellee paid $1,000 in cash to Mr. Hamilton. On January 5, 1909, a stock certificate for 9½ shares was issued to appellee on his contract; on February 29, 1911, another certificate for 25 shares was issued and delivered to him. On or about the 20th day of August, 1914,

Mr. Hamilton surrendered to appellee his note with the dividend statement indorsed thereon showing excess dividends collected on the stock in the language of the indorsement as written on the note, "Balance due Studdert $11,582.91." On the 19th day of October, 1914, the balance of the stock was issued and delivered to Studdert and from that date all future dividends on the stock were paid to appellee. Mr. Hamilton died on August 5, 1922, and appellant duly qualified as executor of his will, having been named such by the terms of the will. After the death of Hamilton and the qualification of appellant as his executor, appellee, claiming that Hamilton was due him a balance of excess dividends, in the sum of $20,859.95 collected by Hamilton prior to the settlement of 1914, presented his claim for that sum to appellant as executor, which claim was in all respects refused. Thereupon, appellee instituted this suit to recover his claim.

In addition to alleging the execution of the note and contract set out above, and the collection of all dividends on the stock by Hamilton to August 20, 1914, and the payment by him to Hamilton on the 22d day of June, 1913, of the $1,000, which he alleged was paid as a credit on the note, he further alleged, in substance, quoting from appellant's brief:

"That the relations between appellee and Hamilton were at such time and for many years prior thereto of the most friendly and confidential nature."

"That subsequent to August 20, 1914, appellee and Hamilton caused a check to be made of the dividends paid to Hamilton and it was then found that the note had been overpaid and that Hamilton had in his hands a large sum of money so overpaid. That Hamilton thereupon delivered the stock to appellee and stated to appellee that whenever he desired to have the money the amount would be definitely ascertained and promptly paid, pending which it would be safely kept for appellee. That having confidence in said Hamilton appellee never made any request or demand for said sum of money prior to the death of Hamilton, which occurred August 5, 1922."

"That prior to the maturity of the note the dividend paid to Hamilton had overpaid the note by the sum of $359.95 and thereafter Hamilton received the additional sum of $20,500.00, making a total of $20,859.95 which Hamilton was obligated to pay. That after the death of Hamilton and the qualification of appellant as Executor and Trustee, to wit, August 1, 1923, appellee made demand for the payment of this sum, which was refused. Prayer was for judgment for $20,859.95 with interest at 6% per annum after August 1, 1923."

A theory of appellee's petition was that Hamilton, after the settlement of 1914, held the excess dividends in trust for appellee from the date of that settlement to the time of his death. Appellant summarizes its answer as follows:

"1. A general demurrer.

"2. A special exception based on the statutes of limitation.

"3. A special exception based on laches and stale demand, due to the death of Hamilton and long lapse of time.

"4. A general demurrer.

"5. A plea of limitation under the two and four years statutes.

"6. A plea of laches and stale demand, based on long lapse of time and the death of Hamilton.

"7. A special plea to the effect that the facts were sufficient to establish (a) accord and satisfaction, (b) a conclusive presumption that any sums which may have been due by Hamilton to appellee had been paid, and (c) that appellee had waived all rights and was estopped to claim that he had not been paid."

On conclusion of the evidence, appellant filed its motion for an instructed verdict, which was overruled; whereupon the following special issues were submitted to the jury, answered as indicated:

"Special Issue No. 1.

"Did H. Hamilton receive any dividends from the stock sold by him to James H. Studdert? If so, please state the dates and amounts in dollars and cents."

Answer: "Yes. Oct. 31, 1907, $1500.00; July 20, 1908, $1500.00; Aug. 31, 1908, $1500.00; May 15, 1909, $3750.00; Nov. 26, 1909, $3750.00; Feb. 16, 1910, $1650.00; Aug. 31, 1910, $6,000.00; July 25, 1911, $7500.00; Jan. 15, 1912, $1875.00; Mar. 4 or 14, 1912, $2250.00; Nov. 30, 1912, $1500.00; July 9, 1913, $3750.00; Sept. 9, 1913, $3750.00; May 25, 1914, $7500.00; Aug. 20, 1914, $3000.00."

"Special Issue No. 2.

"Of the dividends, if any, received by H. Hamilton, on the 150 shares of stock sold by him to Studdert, did the said Hamilton pay any part thereof to said Studdert in any manner other than by applying the same to the satisfaction of the principal and interest on Studdert's note to Hamilton?"

Answer: "Yes. $9150.00."

"Special Issue No. 3.

"At the time that the certificate for 115½ shares of stock was delivered by Hamilton to Studdert, did Studdert waive any claim that he had to any dividends that might have been collected by Hamilton in excess of the amount due for the stock."

Answer: "He did not."

"Special Issue No. 4.

"Did Studdert accept the figures endorsed on the back of the note by Autrey as a true

and correct statement of the amount he claimed to be due him by Hamilton?"

Answer: "He did."

Judgment was entered in appellee's favor for the amount found by the jury to be due him, with interest.

█ In view of the disposition we are making of this case, it is not necessary to review and discuss in detail the following propositions advanced by appellant: (a) Appellee failed to prove that the balance stated on the note as the amount due him by Hamilton was unpaid; (b) under the undisputed facts surrounding and explaining the settlement of 1914, the relations between appellee and Hamilton were reduced to "an account stated"; (c) the contract and agreement between appellee and Hamilton did not create an express trust as of date August 17, 1907, appellant's contention being "that the transaction amounted only to an executory agreement, and the equitable title to the stock did not vest in appellee at the time of the execution of the instrument"; (d) the $1,000 paid on June 22, 1913, as an independent item of recovery was barred by limitation. If we understood appellant correctly, this proposition (d) was abandoned on oral argument. It is sufficient to say that the evidence supports the jury's answer on all issues submitted. The settlement of 1914 did not reduce the relations between appellee and Hamilton to "an account stated," as that term is used in the law of this state. The contract, in our judgment, did create an express trust as of date August 17, 1907. We summarily overrule these propositions, believing they are not sound, without discussing them further, because they are immaterial upon the theories on which we are reversing and rendering the judgment of the lower court in favor of appellant.

Appellant's remaining propositions are, in our judgment, decisive of this appeal, and are as follows: (a) The 1914 settlement between Mr. Hamilton and appellee, by which Mr. Hamilton canceled and surrendered the note and issued the stock to appellee, fully performed and terminated the trust under which Mr. Hamilton had collected the dividends, and as a result the relations between the parties, subsequent to the settlement, were that of debtor and creditor; (b) or, if a trust relation did exist, it was nothing more than a constructive trust. We think both these propositions are sound, from which it follows that appellee's cause of action had long been barred by limitation at the time this suit was instituted.

We will first consider the proposition that the trust, created by the agreement of August 17, 1914, and the conduct of the parties, following the expiration of the five-year period named in that agreement, was terminated by the settlement of 1914. This proposition presents two theories of the law:

(a) Mr. Hamilton tendered the settlement of 1914 upon the figures indorsed upon the note, with the written statement that he was due that sum to appellee, and, as part of the settlement, canceled and surrendered the note and delivered to appellee his stock. The issue raised by appellee receiving his canceled note with the indorsement thereon was thus submitted to the jury: "Did Studdert accept the figures endorsed on the back of the note by Autrey as a true and correct statement of the amount he claimed to be due him by Hamilton?" To which the jury answered: "He did." This was an affirmative finding by the jury that appellee himself construed this final agreement as the creation of the relation of debtor and creditor between him and Mr. Hamilton. We say this because the jury found, not that appellee accepted this settlement as a correct statement of the amount Mr. Hamilton was holding in trust for him, but as a correct statement of the amount "due him by Hamilton." As we construe the record, the issue was clearly raised that Mr. Hamilton dealt with appellee as his creditor and not as his trustee. We say this because, in surrendering appellee his note, he did so with the statement indorsed thereon, "Balance due Studdert $11,582.91." Had he intended to hold this in trust, he could and would probably have used language appropriate to a trust relation. No witness testified to any language ever used by Mr. Hamilton, after this settlement, to the effect that he was holding any money in trust for appellee, but only that he was, quoting the witness Autrey, "indebted" to appellee. Mr. Autrey testified: "After the note had been surrendered to Studdert Mr. Hamilton mentioned owing Mr. Studdert money several times; that is, owing him for the excess due him for dividends collected over the amount that Mr. Studdert owed Mr. Hamilton—that is, that he had over-collected his indebtedness, and that because of that he was indebted to Studdert."

█ We think it is a reasonable construction of the testimony quoted to say that the parties themselves intended that the settlement of 1914 should create between them the relation of debtor and creditor and that this issue was foreclosed by the answer to question No. 4. Certainly no one would deny that a trustee and his beneficiary, dealing with an express or resulting trust of the nature shown by these facts, can change the trust relation to that of debtor and creditor. When that is done the contract thereby created is within the statute of limitation. Thus it is said in Bogert on Trusts, p. 554: "When the relation of trustee and cestui que trust changes to that of debtor and creditor, obviously the statute of limitations applicable to contract claims will control."

What we have said is not a forced construction of the language of the witness Autrey nor of the indorsement on the note at the time it was delivered to appellee, nor of the finding of the jury in answer to question No. 4. There is a clear legal distinction between "debts" and "trusts." This distinction was sharply drawn in Thornburg v. Buck, 13 Ind. App. 446, 41 N. E. 85, where, deciding the issue and defining the distinction, the court says, as brought forward in 2 Words and Phrases, First Series, p. 1885: "'Debt,' as used in the by-laws of a banking corporation, declaring that the bank reserves a lien upon all stock issued to and held by any stockholder for the security of any debt owing in any form to said bank by such stockholder, whether the same is due or not, is to be construed to include unpaid subscriptions on such stock, though no call has been made for the payment thereof."

This distinction is thus defined by Bogert, page 16:

"The trust is distinguished from a debt in that—

"(a) The trust involves specific subject matter, whereas the debt does not;

"(b) The trustee's obligations are equitable, while the debtor's are legal;

"(c) The trustee occupies a fiduciary relation, but the debtor does not."

As the language of the evidence and of issue No. 4 was clearly the language of "debt," as distinguished from "trusts," we believe it should be so construed.

(b) On another theory we think the settlement of 1914 terminated the trust relation between the parties and created between them the relation of debtor and creditor, as a matter of law. The original contract created an express trust which was to run for five years, but, as no settlement was requested or tendered at the expiration of that period, for the purpose of this argument, we agree with appellee that limitation did not begin to run on expiration of the five-year period. This concession has support in Jones v. Home Saving Bank, 118 Mich. 155, 76 N. W. 322, 324, 74 Am. St. Rep. 377, where the court said: "The mere fact that money due the cestui que trust is allowed by him to remain in the hands of the trustee does not change the nature of the debt, and, until an accounting was had or demanded, the statute of limitations did not run. 2 Perry, Trusts, p. 513, § 863, and cases cited; Frank v. Morley's Estate, 106 Mich. 635, 64 N. W. 577. Judgment affirmed. The other justices concurred."

On this concession the intent of the parties in making the written contract was that Mr. Hamilton should hold the stock and all dividends until the dividends collected paid the note and he was ready to tender appellee a settlement on the dividends and cancel his note and surrender to him his stock or until appellee demanded a settlement. The time of the settlement was left to Hamilton to be tendered when, in his judgment, the purposes of the trust had been executed or when requested by appellee. Hamilton exercised his judgment in this matter, and tendered the settlement in 1914, canceling appellee's note and surrendering to him the stock. The duration of the original trust, as thus extended by the conduct of the parties, was not expressly fixed by contract, but was impliedly fixed at a time within which the purposes of the trust could and should be executed. Under the settlement of 1914 every purpose of the original trust was discharged. What was the effect of that settlement of the trust? On this issue Bogert says: "Although a settlor may not have expressly stated the trust term, or measured it by lives, years, or similar standards, he may impliedly have fixed the duration of the trust by his statement of its purpose. It is rudimentary law that a trust will last no longer than necessary for the accomplishment of its purpose. If the settlor has not otherwise fixed the end of the trust, he will be deemed to have intended that it should last till the trust purpose was attained."

In Kohtz v. Eldred, 208 Ill. 60, 69 N. E. 900, 903, it was said: "Where a testator by his will creates a trust and fixes the duration thereof, his direction will, if not in violation of the rule against perpetuities, be given effect and the trust will continue for the time indicated; but where a testator does not specifically indicate the time for which the trust is to continue, his intention must, if possible, be determined from the entire will. Where the evident purpose of a trust is the accomplishment of a particular object, the trust will terminate so soon as that object has been accomplished."

When the settlement was tendered and accepted, of course the parties could have, expressly or impliedly, created a new trust. This new trust would have been independent of the trust that had been terminated by the settlement of 1914. Such a trust could be established only by the express language of the parties or result therefrom. Admittedly nothing was said about a new trust. Then we have only the conduct of the parties, which consisted of nothing more than the fact that Hamilton did not offer to pay to appellee the balance of the excess dividends left in his possession and appellee did not ask that they be paid to him.

As no new trust was created by the settlement of 1914, the proposition is simply this: Where the trustee tenders a settlement to his beneficiary, which the beneficiary accepts, and as a result of the settlement the purposes of the trust have been discharged, but the trustee does not pay over to his beneficiary nor does the beneficiary ask for the payment of the balance of the trust fund, is this balance held as a trust fund not within the stat-

ute of limitations, or is it held as money had and received within the bar of the statute?

█ It is settled law, as we understand the law, that, where an account has been rendered or settlement had or demanded on the expiration of the trust, limitation begins to run from the date of settlement or demand for settlement. In Gilmore v. Ham, 142 N. Y. 1, 36 N. E. 826, 828, 40 Am. St. Rep. 554, speaking for the court, Mr. Justice Finch said: "In the case of a direct trust the statute will begin to run when it ends, and the trustee has no longer a right to hold the fund or property as such, but is bound to pay it over, or transfer it discharged from the trust."

Now in this case, when Mr. Hamilton tendered the settlement in 1914, which appellee accepted, he no longer had the right to hold the excess dividends as trustee, and, in fact, did not so hold them, for the trust was fully discharged, and by the settlement he was made liable to suit without any demand for the funds left in his possession.

The following proposition was announced in Mills v. Mills, 115 N. Y. 80, 21 N. E. 714, 715, defining when suit may be instituted "without any demand" and the operation of the statute of limitations against such a claim: "When money is received by one to and for the use of another, under circumstances that it is his duty at once to pay it over, then an action for money had and received may be brought to recover it without any demand, and in such a case the statute of limitations begins to run from the day of the receipt of the money."

While Mr. Hamilton did not receive the sum sued for on the date of the settlement, his right to hold it under the original trust ceased at that time, and, by the settlement, he became liable to suit thereon without demand, as shown by the next case cited. In Finney v. Cochran, 1 Watts & S. (Pa.) 112, 37 Am. Dec. 450, Finney held certain bonds as collateral security to indemnify him against loss under an express trust. In accordance with the agreement, he converted the bonds into money and satisfied certain demands, as per the trust agreement, but failed to pay over or account to the beneficiary for the surplus. The suit was against Finney to recover this surplus, and on the question of limitation the court said: "The last of the money received by the defendant in discharge of the four bonds mentioned in his first receipt to the plaintiff, was as far back as the 11th of October 1831, something more than eight years anterior to the commencement of this action. The whole of the money received on the three first of these bonds, and a part of that received on the fourth, the defendant, by the terms of the receipt which he gave to the plaintiff for the bonds, had a right to retain to reimburse him for the twelve hundred and twelve dollars and eighty cents, paid in June 1825, in discharge of his endorsement for the benefit and accommodation of the plaintiff. But the surplus the defendant was bound and ought to have paid or settled in some way with the plaintiff, without delay, after his receipt of it. If he neglected or failed to do this, the plaintiff might have brought his action for the recovery of it immediately, for it had become a debt due to the plaintiff, which the defendant was bound to pay him without even a demand being made for it. His right to maintain such action, therefore, accrued at the time the defendant received this surplus; and from that instant the statute of limitations commenced running, so that the six years, the time allowed by the statute for commencing suit, had run some two years and a half before it was commenced."

The following quotation from Hancock v. Franklin Insurance Co., 114 Mass. 155, is squarely in point on this proposition: "On June 30, 1849, the plaintiff's intestate gave his note for $5,000 to the defendants, payable in three months, and at the same time pledged with them, as collateral security therefor, a United States bond for $5,000, with interest coupons attached. The defendants from time to time collected the coupons and applied the proceeds to the payment of the interest upon the note. In January, 1863, the bond became payable, and the defendants collected it in gold coin. If there had been no difference in value between gold coin and paper currency, the rights of the parties would be plain. It was the duty of the defendants, holding the bond as collateral security, to collect it at its maturity. When collected, the law would apply its proceeds to the payment of the debt, so far as necessary, and the balance would be held by the defendants as money received to the use of the plaintiff. Thayer v. Mann, 19 Pick. [Mass.] 535. The ground taken by the defendants, that the note was outlawed, and therefore that they had the right to treat the collateral as their absolute property, cannot be sustained. They had the right, at any time after the note matured, upon giving notice to the pledgor, to sell the bond and apply the proceeds to the payment of their debt. Gen. Sts. c. 151, §§ 9, 10; Whipple v. Blackington, 97 Mass. 476; Fletcher v. Dickinson, 7 Allen, 23; Washburn v. Pond, 2 Allen, 474; Brown v. Tyler, 8 Gray, 135 [69 Am. Dec. 239]; Hunt v. Nevers, 15 Pick. 500 [26 Am. Dec. 616]. Not having done so, they continued to hold it in trust for the benefit of all parties. The pledgor might avail himself of the statute of limitations as a defence to a suit upon the note. But the statute affects merely the remedy on the note, and does not, on the one hand, defeat the lien of the pledgee upon the property pledged, nor, on the other, enlarge that lien to an absolute title to the property. If, therefore, the note to the defendants was out-

lawed (which need not be determined), *upon the collection of the bond held as collateral, the proceeds went to the payment of the debt, and the balance was money belonging to the plaintiff, and could be recovered in an action for money had and received. The statute of limitations would begin to run against such action from the time when the defendants received the money.*" (Italics ours.)

Mills v. Mills, supra, is also interestingly in point. In that case Theodore G. Mills and Hiram P. Mills were brothers. Theodore, being indebted to his brother, gave him a note in the sum of $3,434.63 and conveyed him certain lands. Thereupon Hiram gave to his brother a written contract reciting the fact of the indebtedness and the conveyance of the land to him and agreeing to sell. After paying himself the amount of the note as well as the advances he might make in the way of taxes, insurance, costs, etc., he agreed to turn the surplus over to the said Theodore. All of the lands were sold by Hiram during the lifetime of his brother Theodore, and, in a suit by the widow of Theodore against Hiram, it was alleged that Hiram had received sums of money in excess of the amount of all debts and advances due him and he was sued for the alleged balance of $6,717.27. Discussing the issue of limitation, the court said: "Long before his brother's death he [Hiram] had sold all the lands and received more than sufficient for his reimbursement. After the sale of the lands he ceased to be mortgagee. He must be deemed to have sold the lands for the satisfaction of his mortgage, and it was satisfied. So far as he received the proceeds of the sales they were applicable, and must be deemed to have been applied, for his reimbursement. After he had been fully reimbursed, the proceeds of the lands which came to his hands were received by him to and for the use of his brother, and it was his duty at once to pay over such surplus proceeds to his brother, and upon his failure so to do he was liable without any demand to suit for their recovery."

In Vernor v. Sullivan & Co. (Tex. Civ. App.) 126 S. W. 641, 645, the surety on a note paid it and thereby became subrogated as between himself and the payee, Sullivan & Co., to the proceeds of a note of a third person held by Sullivan & Co., and as assignee of the surety Vernor acquired the right to such proceeds. Sullivan & Co. collected the note but did not account to Vernor for the same. The suit was by Vernor to recover the proceeds of this note. The defense was limitation. Discussing that issue, the San Antonio Court of Civil Appeals said: "There was no agreement by Sullivans to receive and hold this money as a continuing relation. They were, according to Vernor's testimony concerning the assignment, to collect and receive it for him. Their duty was to pay it over to Vernor at the time they received it, or to apply it to his credit. No understanding between them was had or contemplated as

to their holding this fund in trust for Vernor after it was collected. We cannot perceive, in the circumstances surrounding this transaction, any room for the contention that D. Sullivan & Co. held this fund by a continuing trust for Vernor; on the contrary it clearly was nothing more than a collection of money for Vernor, and payable to him or to his credit as soon as collected."

On the same point Boydstun v. Jacobs, 38 Nev. 175, 147 P. 447, 449, said: "Where an act is done by a trustee which purports to be an execution of a trust, he is thenceforth to be regarded as standing at arm's length from the cestui que trust, who is put to the assertion of his claim at the hazard of being barred by the statute."

In Clarke v. Boorman, 18 Wall. 493, 509, 21 L. Ed. 904, the Supreme Court of the United States said: "It may be conceded that, so long as a trustee continues to exercise his powers as trustee in regard to property, that he can be called to an account in regard to that trust. But when he has parted with all control over the property, and has closed up his relation to the trust, and no longer claims or exercises any authority under the trust, the principles which lie at the foundation of all statutes of limitation assert themselves in his favor, and time begins to cover his past transactions with her mantle of repose."

■■ We think the authorities cited fully sustain the proposition that the settlement of 1914 terminated the original trust and created between Mr. Hamilton and appellee the relation of debtor and creditor, starting the running of the statute of limitation from that date. With the exception of the Vernor Case, none of the authorities cited are by the courts of this state. However, the law of trusts in Texas is not statutory, but has been evolved from principles of general jurisprudence recognized and enforced by the federal and state courts of the United States. We have found no Texas Case directly in point on the main proposition discussed, and, for the reasons stated, the question should be decided on principles of general jurisprudence. Some of the authorities reviewed were cited by appellant on the proposition that all dividends in excess of the amount due on the note were received by Mr. Hamilton without authority and were held by him from the date of the settlement as money had and received. However, these authorities also directly support the proposition that the settlement of 1914 terminated the original trust relation. We have given most careful consideration to appellee's authorities, most of which are decisions by the courts of Texas, and have found nothing in any of them conflicting in the least with any conclusion stated by us herein. But we think all authorities cited by both parties to this appeal are in full accord on the proposition that a settlement of a continuing trust where-

by the original purposes of the trust are fully discharged terminates the trust, and that, subsequent to the settlement, the relation between the parties is merely that of debtor and creditor, or, at the most, a constructive trust.

So we say, if Mr. Hamilton continued to hold the excess dividends after the settlement of 1914, as trustee, the relation was nothing more than a constructive trust. It must be borne in mind that no new trust agreement was created between the parties by the settlement of 1914. After that settlement Mr. Hamilton no longer had any contractual right, express or implied, to hold the excess dividends. It follows, on these facts, that, if a trust relation existed, it was nothing more than a constructive trust which, under the decisions, was within the bar of the statute of limitations from the date that appellee knew of the possession of his money by Mr. Hamilton. He knew that fact from the date of the settlement of 1914. This proposition has support in Dunn v. Dunn, 137 N. C. 533, 50 S. E. 212. In that case a testator, by will, gave $400 to his son in trust for the use and benefit of another son, Benjamin C. Dunn, who was to receive the interest thereon until his death. At the death of Benjamin C. Dunn, the $400 was to be paid to his two children. The trustee continued to hold the money after the death of Benjamin C. Dunn, and some years later was sued by the two children. Limitation was pleaded, and the court said: "The sole express trust reposed in W. B. Dunn by the will was to hold the fund 'for the sole use and benefit of Benjamin C. Dunn,' to receive and pay over the interest to him annually. At the death of the life tenant the express trust terminated. Baker v. McAden, 118 N. C. 744, 24 S. E. 531. The trustee then held the fund simply upon an implied trust to pay over to the plaintiffs, to whom, by the terms of the will, the title to the fund then passed. The trustee was charged with no duty save that imposed by the law to pay over when called on. The statute runs against an implied trust."

It follows that the judgment of the lower court in favor of appellee should be reversed, and judgment here rendered in favor of appellant, and it is accordingly so ordered.

### On Rehearing.

If a trust relation continued after the settlement of 1914, it was of the same nature and character as before the settlement. So we were in error on original submission in our conclusion that, "if Mr. Hamilton continued to hold the excess dividends after the settlement of 1914 as trustee, the relation was nothing more than a constructive trust."

Under the theory of law upon which we have based our opinion, the issue of constructive trust was not in the case. In fairness, however, to appellant, we should say that the issue of constructive trust was advanced as a corollary to the proposition that, in law, the express trust, if there was an express trust, terminated when and as soon as Hamilton collected sufficient dividends to pay the note, and that from that date limitation began to run. As we said in our original opinion, most of the authorities reviewed by us were cited by appellant in support of this proposition. It was in connection with this proposition that the further contention was made that, since the original trust was terminated, if Hamilton continued to collect and hold the excess dividends under a trust relation, it could have no higher dignity than a constructive trust. The proposition thus advanced was supported by the citation of Dunn v. Dunn, cited by us on our theory of constructive trust.

To the extent indicated, appellee's motion for rehearing is granted, but in all other respects overruled. After giving the most careful consideration to appellee's written argument and also to his oral argument in support of his motion for rehearing, we cannot escape the conclusion that the settlement of 1914 terminated all trust relations.

Granted in part; overruled in part.